**UNITED STATES of America**

v.

**Donald PAYDEN, Defendant.**

**No. SS 84 Cr. 566(DNE).**

United States District Court,
S.D. New York.

June 7, 1985.

---

**1274**

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for plaintiff; John K. Carroll, Asst. U.S. Atty., New York City, of counsel.

Robert M. Simels, P.C., New York City, for defendant.

## OPINION AND ORDER

EDELSTEIN, District Judge:

Defendant Donald Payden ("Payden") has moved, pursuant to Fed.R.Crim.P.

46(a), for an order releasing him on $250,-000 bail. The government has cross-moved for an order of detention or, in the alternative, for an increase in Payden's bail to $1 million. Because the court finds that Payden has attempted to hire a fellow inmate for the purpose of murdering a key government witness in this case and her daughter, Payden's bail application is denied and the government's motion for an order of detention is granted.

## BACKGROUND

The facts of this case are set forth in this court's opinion of December 3, 1984, *United States v. Payden*, 598 F.Supp. 1388 (S.D.N.Y.1984), *rev'd*, 759 F.2d 202 (2d Cir. 1985), but the court will review the facts pertinent to this motion. Payden was arrested on August 3, 1984 and brought before a Magistrate who set bail at $250,-000.00. Payden was unable to post this amount and was remanded. On August 13, 1984, Payden was named in a two count indictment charging him with conspiracy to violate the federal narcotics laws, in violation of 21 U.S.C. § 846, and distribution and possession with intent to distribute heroin, in violation of 21 U.S.C. § 841. Payden was arraigned on August 23, 1984 and bail was continued. On October 10, 1984, the government filed a superseding indictment, which added a count under 21 U.S.C. § 848, charging Payden with organizing and supervising a continuing criminal enterprise. Payden was arraigned on the superseding indictment on October 17, 1984. Bail was not discussed. On October 31, 1984, the government moved for an order of detention, pursuant to the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.* After a hearing and based on the record in this case, the court granted the government's motion for pre-trial detention, finding that "no condition or combination of conditions provide sufficient assurance that the defendant will not continue the conduct alleged in the indictment and appear when required." *United States v.*

*Payden,* 598 F.Supp. 1388, 1399 (S.D.N.Y. 1984).

On March 26, 1985, the Court of Appeals for the Second Circuit reversed the order of detention, holding that because the detention hearing was not held on October 17, 1984—the date of Payden's "first appearance" before the judicial officer after the filing of the first superseding indictment—the new Bail Reform Act was incorrectly applied to Payden. The court remanded the case "for consideration in accordance with the bail laws under which the court was effectively operating at the time of Payden's arraignment [on the first superseding indictment on October 17, 1984]."[1] *United States v. Payden,* 759 F.2d 202, 205 (2d Cir.1985).

On April 22, 1985, Payden moved for an order of release on the $250,000.00 bail set on August 3, 1984. The government cross-moved for an order of detention based on new information. The government alleges that sometime in February of 1985, James Turner, then an inmate at the Metropolitan Correctional Center ("MCC"), informed the superintendent of the MCC that Payden had approached him and asked for his assistance in murdering Claudine J. Jones, a government informant. The court held a hearing on the motions from May 9 through May 13, 1985. James Turner was the only government witness at the hearing. Payden elected not to present any testimony on his own behalf.

## I. APPLICABILITY OF THE BAIL REFORM ACT OF 1984

The government argues that the Bail Reform Act of 1984 should be applied to Payden. The government contends that under the Bail Reform Act of 1984, the government may seek pre-trial detention of a defendant at a time other than the defendant's "first appearance" before the judicial officer. In support of this contention, the government relies on 18 U.S.C. § 3142(c), which allows a district judge "at any time [to] amend his order to impose additional or different conditions of release," and 18 U.S.C. § 3148(a), which provides that an order of detention may issue as to any defendant who violates a condition of his release order. The government also refers the court to *United States v. Resek,* 602 F.Supp. 1126 (S.D.N.Y.1985), in which Judge Keenan held that the government may seek detention of a defendant after his first appearance, provided the government can demonstrate that there exists "dramatic new information."

■ The court finds the government's argument on this point persuasive; however, the mandate issued by the court of appeals in its March 26, 1985 opinion directs the court to apply the law as it existed prior to the enactment of the Bail Reform Act of 1984. The court of appeals held:

> The new Bail Reform Act was incorrectly applied to defendant Payden. Rather than permit a special exception to the first appearance requirement as a result of the timing of this case, thereby potentially weakening the procedural fabric of the Act, we reverse the decision of the district court and remand for reconsideration in accordance with the bail laws under which the court was effectively operating at the time of Payden's arraignment.

*United States v. Payden, supra,* 759 F.2d at 205. Even though the Bail Reform Act of 1984 provided for immediate repeal of the Bail Reform Act of 1966, *see United States v. Zannino,* 761 F.2d 52, 54–57 (1st Cir.1985) (Bail Reform Act of 1984 applies

---

1. On February 25, 1985, while the court's detention order was *sub judice* in the court of appeals, the government filed a second superseding indictment which, in addition to the charges in the first superseding indictment, contained a detailed list of items sought pursuant to the forfeiture provision, including cash, a 25% interest in a company as represented by shares of stock, an automobile and jewelry. The court

did not hold a detention hearing on Payden's "first appearance" before the court on the second superseding indictment because at that time, the court's December 3, 1984 order of detention was still in effect. The court of appeals decision apparently precludes a detention hearing under the new act at this time based on the "first appearance" requirement.

to defendant released on bail under 1966 Bail Act); *United States v. Angiulo,* 755 F.2d 969, 970–974 (1st Cir.1985) (Bail Reform Act of 1984 applies to defendant incarcerated and seeking release on bail at the time of the passage of the new act), this court is bound by the court of appeals mandate that the old law be applied ·to Payden.

▪ Under the law as it existed prior to October 12, 1984, the court has the power to revoke bail and remand the defendant if it finds that the defendant has threatened witnesses. *United States v. Graewe,* 689 F.2d 54, 56–57 (6th Cir.1982) (per curiam); *United States v. Wind,* 527 F.2d 672, 675 (6th Cir.1975); *United States v. Gilbert,* 425 F.2d 490, 491–92 (D.C.Cir.1969); *see Carbo v. United States,* 82 S.Ct. 662, 668, 7 L.Ed.2d 769 (1962) (Douglas, Circuit J.); *cf. United States v. Kirk,* 534 F.2d 1262, 1280–81 (8th Cir.1976) (detention during trial), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1174, 51 L.Ed.2d 581 & 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977); *United States v. Cozzetti,* 441 F.2d 344, 350–51 (9th Cir.1971) (same). Although this power was not expressly provided for in the Bail Reform Act of 1966, there is ample case authority for the court's extrastatutory power to revoke a defendant's bail prior to trial in order to insure the orderly and expeditious progress of the trial.[2] *Fernandez v. United States,* 81 S.Ct. 642, 644, 5 L.Ed.2d 683 (1961) (Harlan, Circuit J.) ("District courts have authority as an incident of their inherent powers ... to revoke bail."); *see United States v. Graewe, supra,* 689 F.2d at 57; *United States v. Wind, supra,* 527 F.2d at 675; *cf. Bitter v. United States,* 389 U.S. 15, 16, 88 S.Ct. 6, 7, 19 L.Ed.2d 15 (1967) (per curiam) ("A trial judge indisputably has broad powers to ensure the orderly and expeditious progress of a trial. For this purpose, he has the power to revoke bail and to remit the defendant to custody. But this power must be exercised with circumspection. It may be invoked only when and to the extent justified by danger which the defendant's conduct presents or by danger of significant interference with the progress or order of the trial."). Thus, if the court finds substantial evidence that the defendant has threatened or interfered with government witnesses, or that his release would pose a danger to the community, it may remand the defendant without bail before and during the trial.[3]

---

**2.** In the December 3, 1985 opinion, this court found that no condition or combination of conditions of Payden's release will assure the safety of the community. That factual finding was not disturbed by the court of appeals and this court has not been given any new information that would warrant a reconsideration of that finding. Indeed, in light of Turner's testimony, the prospect of Payden's release poses an even greater danger to the community than the court had originally envisioned.

Some courts have held that under the Bail Reform Act of 1966, the court has the power to remand a defendant without bail if it finds that defendant poses a substantial danger to the community. *United States v. Markowski,* 582 F.Supp. 1276, 1278 (N.D.Ind.1984); *see also United States v. Graewe,* 689 F.2d 54, 56 (6th Cir.1982) (court of appeals affirms district court's detention order without reaching district court's determination that defendant's continued drug trafficking posed a danger to the community, warranting his pre-trial incarceration); *cf. United States v. Kostadinov,* 572 F.Supp. 1547, 1550 (S.D.N.Y.1983) (danger to the community posed by defendant's release made for "extreme and unusual circumstances" warranting denial of bail), *aff'd on other grounds,* 721

F.2d 411 (2d Cir.1983). *But see United States v. Melville,* 306 F.Supp. 124, 126–27 & n. 2 (S.D.N.Y.1969). The court does not rely on this ground for remanding Payden. The court relies exclusively on Payden's interference with government witnesses as the basis for his remand without bail.

**3.** On March 22, 1985, the government submitted an *in camera* affidavit in opposition to Payden's motion to have the government publish a list of its witnesses prior to trial. The *in camera* affidavit contains allegations that Payden has taken part in several murders and attempted murders. In *United States v. Wind,* 527 F.2d 672, 676 (6th Cir.1975), the Court of Appeals for the Sixth Circuit held that any reliance by the district court on testimony given at an *in camera* hearing from which the defendant and his attorney were excluded is error. Accordingly, this court has not relied on the *in camera* affidavit and gives it no weight with respect to the bail application. The affidavit will only be considered in the court's determination of Payden's omnibus pretrial motions, which are presently *sub judice.*

It should be noted that the government has not acted improperly in submitting this affida-

## II. FINDINGS OF FACT

At the hearing, James Turner ("Turner") testified in support of the government's application for detention. Evidence produced at this hearing demonstrates that Payden has attempted to interfere with government witnesses and that these actions are serious enough to warrant detention. Turner was an inmate with Payden at the MCC. Between August 1984 and January 1985 the two had periodic conversations. During these conversations, Turner told Payden that he had shot a bank guard. Tr. 61. In fact, Turner has a history of committing murder as well as other serious offenses. In 1965 Turner killed a man with a butcher knife over a dispute involving a woman. In 1978, Turner was convicted of bank robbery. In 1985, Turner was again convicted of bank robbery. Turner has admitted that during the latter bank robbery he shot an unarmed guard at the bank. Thus, aware of Turner's history and his willingness to commit murder, Payden told Turner in January of 1985 that he wanted to kill a government witness whom he then identified as "Diane Turner." On a number of occasions, Payden asked Turner to kill this witness and offered to "pay [Turner] good" for his services. Tr. at 62. Sometime subsequent to his initial approaches to Turner, Payden was visited by a girlfriend who, Payden told Turner, brought Payden an Indianapolis address of the target witness. When Payden communicated that address to Turner, he informed Turner that he also wanted the witness' daughter killed.

Payden gave Turner an address and telephone number where Turner could make initial arrangements for the contract murders, should Turner be released and interested in Payden's proposition. From August of 1984 until his trial on the bank robbery charges in March of 1985, Turner was convinced that he would be "getting out any time." He had made an application before the court to find him mentally incompetent to stand trial and apparently was confident that such application would be granted. Turner was not tried on the bank robbery charges until March 1985. Thus, at the time Payden approached Turner about the murder contract, both Turner and Payden believed that Turner would not be in prison for long.

█ Payden contends that there is not sufficient evidence connecting "Diane Turner," the person Turner states Payden asked him to kill, and Claudine Jones, the government's witness against Payden. It is well settled that a trier of fact may make inferences from proven facts based on common experience and logic. *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 744 (2d Cir.1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). The fact that Payden did not identify Claudine Jones by her correct name is to be expected. Until Payden had firmly secured Turner's acceptance of the proposed murder contract, Payden had no reason to disclose the target's real name. Any transaction involving high risk and unlawful behavior, such as what was contemplated here, is likely to be carried out in a clandestine manner through the use of some form of code. However, the descriptive information provided by Payden to Turner clearly identifies Claudine Jones as the target of Payden's threats. Payden described his target as a woman who was testifying against him. Payden also stated that the target was from Indiana and has a daughter, facts which also apply to Claudine Jones. Finally, Payden stated that the target and Payden's "brother" were both serving twenty-year sentences for narcotics violations. Both Jerry McGee[4] and Clau-

---

vit. The affidavit was submitted when this court's detention order of December 3, 1984 was still in effect and four days before the court of appeals had issued its opinion which reversed the order of detention. Thus, the government was not attempting to improperly influence this court as to its bail determination but was merely responding to the court's inquiry as to why it would be dangerous for the government to disclose its witnesses prior to trial.

4. At the time of Jerry McGee's arrest, he identified himself as Payden's half brother. Although the government does not believe McGee is in fact Payden's half brother, the fact that McGee

dine Jones are presently serving twenty year sentences for narcotics violations. The court finds substantial evidence that "Diane Turner" is Claudine Jones.

Payden states a number of reasons why the court should not believe Turner's testimony. First, Payden contends that Turner has a strong motive for lying. He is up for sentencing before Judge Kram on the bank robbery conviction and his cooperation in this action will likely weigh in his favor before Judge Kram. Moreover, Turner testified that in January of 1985, Payden struck Turner, apparently in an argument over the Superbowl, and broke his glasses. Payden contends that Turner then contrived this story about Payden's murder solicitations in order to get even with Payden. Second, Payden contends that Turner has shown a willingness to lie under oath to further his own interests. In the hearing before this court, Turner candidly admitted on direct examination that he had fabricated his incompetency defense before Judge Kram and feigned insanity in order to avoid incarceration. To further his insanity defense, he had lied to psychiatrists, taken drugs he knew he did not need and perjured himself before the court. Payden argues that the testimony of an admitted liar is not to be believed. Third, Payden refers to reports of psychiatrists who have examined Turner previously and have described him as an anti-social and paranoid personality. Payden characterizes Turner as an individual who "when he imagines himself to have been crossed, predictably attempts to retaliate either physically (by striking, shooting, etc.), or by falsely accusing the party he believes has offended him." Payden's Memorandum of Law at 5.

The court, after considering all of these factors, finds Turner's testimony credible. The court notes that Turner came forward with this information at a time, not only when he had little to gain, but also when it was against his penal interests to come forward. Turner provided this information to the supervisor of the MCC in January of 1985. At that time the trial on the bank robbery charges had not even begun. Moreover, Turner was awaiting a decision by Judge Kram on his incompetency claim. By following proper procedure and exposing Payden's threats, Turner ran the risk of undermining his own incompetency defense. Moreover, in January of 1985, when Turner reported Payden's solicitations, the court's order of detention against Payden was still in effect. Thus, if Turner wanted to "get even" with Payden, he was gaining little by reporting him, because Payden's prospects for release at that time were not very good in any event.

Moreover, the fact that Turner stands to gain by his testimony does not mean he is incapable of testifying truthfully. *See United States v. Cheung Kin Ping,* 555 F.2d 1069, 1073–74 (2d Cir.1977). It must be recognized that any person whom a defendant would seek to hire for the purpose of killing a government witness is likely to have demonstrated a contempt for society's laws and mores. Indeed, the court would find *less* credible the allegations that Payden sought out Turner to murder a government witness if Turner were not possessed of highly questionable moral character. Moreover, government informants inform because they know they will receive leniency in return. Thus, the motive to fabricate always attends the testimony of a cooperating witness. Yet, this judge has seen many a defendant convicted beyond a reasonable doubt based on the testimony of government informants.[5] If, after examining the demeanor of the witness and the consistency of his assertions, the court finds the witness' testimony credible, then the court may accept his testimo-

himself used that nomenclature corroborates Turner's testimony.

In January of 1985, the government supplied the court with approximately thirty tapes that it intends to offer at trial against Payden. Mr. McGee is repeatedly identified throughout the tapes as "your brother McGee."

5. Of course the government does not have to prove that Payden has attempted to murder Claudine Jones beyond a reasonable doubt, but only by a preponderance of the evidence.

ny, regardless of the witness' motive and propensity to lie.

The court has considered Turner's mental state and notes that Judge Kram found Turner competent to stand trial. This finding was based in part on the psychiatric evaluation of William S. Logan, M.D., dated May 3, 1984, who found that Turner was capable of "rational as well as factual understanding of the proceedings against him." The court finds Turner to be a competent witness. Payden has not satisfied his burden of showing that Turner does not have personal knowledge of the matters about which he has testified, that he does not have the capacity to recall, or that he does not understand the duty to testify truthfully. *United States v. Lightly*, 677 F.2d 1027, 1028 (4th Cir.1982). Although psychiatrists have noted that Turner has displayed paranoid tendencies, these tendencies do not preclude him from being a competent witness. *United States v. Lightly, supra*, 677 F.2d at 1028; *Shuler v. Wainwright*, 491 F.2d 1213, 1223 (5th Cir. 1974); *United States v. McFarland*, 371 F.2d 701, 704–05 (2d Cir.1966), *cert. denied*, 387 U.S. 906, 87 S.Ct. 1689, 18 L.Ed.2d 624 (1967).

The court has closely scrutinized Turner's testimony. Turner's story was credible and consistently told. It withstood the test of a vigorous and protracted cross examination by Payden's counsel. Payden points to various instances where Turner contradicted himself or lied in his testimony before this court. Defendant's Memorandum of Law at 8–9. However, none of these contradictions concern Turner's recital of Payden's attempt to murder Claudine Jones. A witness may be inaccurate, contradictory, or even untruthful in some respects, and yet be entirely credible in the essentials of his testimony. Despite vigorous cross examination, during which Turner's memory as to the details of his meetings with Payden was severely tested, Turner's testimony remained clear and uncontroverted.

■ Payden contends that even if Turner's testimony is true, there is no need to detain Payden because Claudine Jones is being kept by the government in a "safe" facility. *See United States v. Leisure*, 710 F.2d 422, 426 (8th Cir.1983) (in holding that case was not sufficiently "exceptional" to warrant the remand of defendant without bail, court noted that "the government's principal witnesses are in the government's witness protection program or in federal custody."). The government still "see[s] some danger to Claudine Jones" despite the fact that she is being housed in such a facility. Tr. at 18. Even if the court were to assume that Payden's release would not endanger the life of Claudine Jones, the court must be cognizant of Turner's testimony that Payden also wanted Turner to kill Claudine Jones' daughter. Her daughter resides in the Southern District of New York and has not been enrolled in the witness protection program. The government has not stated whether Claudine Jones' daughter will be a witness in this case. However, if Payden is released, Claudine Jones will be more likely to refuse to testify to save her daughter's life. The court will not allow Payden to use Claudine Jones, or anyone else, as hostage and to demand Claudine Jones' testimony as ransom.

Moreover, the Grand Jury investigation of Payden has not been completed. *See In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Robert M. Simels, Esq.)*, 605 F.Supp. 839, 853–54 (S.D.N.Y. 1985), *appeal argued*, No. 85–6066 (2d Cir. Apr. 26, 1985). Accordingly, the court's interest in protecting witnesses is particularly great in this case. The release of Payden at this juncture may cripple the Grand Jury's continuing investigation, given Payden's demonstrated willingness to kill witnesses and the family members of witnesses who testify against him.

Finally, Payden did not present any testimony on his own behalf. *See United States v. Wind*, 527 F.2d 672, 675 (6th Cir.1975) (in affirming detention of defendant after a hearing in which the district court found that defendant had threatened

witnesses, appellate court noted that defendant did not testify or offer any proof).

## CONCLUSION

The government has submitted substantial evidence that Payden has attempted to arrange the murder of a government witness and her daughter. Under the "extraordinary circumstances" of this case, Payden's detention before and during trial is necessary to protect future witnesses and to further the interests of judicial administration.

IT IS SO ORDERED.